# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple, Inc., One Infinite Loop, Cupertino,<br>California 95014<br>(209-460-9148) | )<br>)<br>)   Case No.  '24 MJ4420<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the     Northern     District of     California    , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952, 960, 963 | Importation of a Controlled Substance and Conspiracy |
| 21 USC Sec. 841, 846 | Possession of a controlled substance with intent to distribute and conspiracy |

The application is based on these facts:
See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____days_ *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ALYSSA A JULIAN  *Digitally signed by ALYSSA A JULIAN*
*Date: 2024.11.22 09:51:52 -08'00'*

*Applicant's signature*

HSI SA Alyssa Julian
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
    telephone    *(specify reliable electronic means)*.

Date:  November 22, 2024

*Judge's signature*

City and state:  San Diego, California       Hon. Allison H. Goddard, United States Magistrate Judge
*Printed name and title*

## **ATTACHMENT A**

Apple Inc. is an Internet Service Provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at One Infinite Loop, Cupertino, California, 95014.

# ATTACHMENT B

I. Service of Warrant

The officer executing the warrant shall permit Apple Inc. (the ISP), as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

II. Items Subject to Seizure from the ISP

    A. All subscriber and/or user information, all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, transactional data and any other files or records for:

    **209-460-9148**

    B. The search of the data supplied by the ISPs pursuant to this warrant will be conducted by the Homeland Security Investigations as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to evidence of violations of 21 U.S.C. Sections 952, 960, and 963 and 21 U.S.C. Sections 841 and 846 for the period of February 11, 2024, up to and including March 11, 2024, and to seizure of:

        A. Communications, records, attachments, files, and data tending to discuss or suggest efforts to import methamphetamine or some other federally controlled substance from Mexico into the United States, or possess and/or transport with the intent to distribute federally controlled substances within the United States;

        B. Communications, records, attachments, files, and data tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or some other federally controlled substance from

  Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

C. Communications, records, attachments, files, and data tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substances within the United States;

D. Communications, records, attachments, files, and data tending to identify travel to or presence at locations involved in the importation of methamphetamine or some other federally controlled substance from Mexico into the United States, or possession and/or transportation with the intent to distribute federally controlled substance within the United States, such as stash houses, load houses, or delivery points; and

E. Communications, records, attachments, files, and data tending to identify the user(s) of the subject accounts, and any co-conspirators involved in the activities in II.B(A)-(D) above;

F. Communications, records, attachments, files, and data that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts;

**which are evidence of violations of Title 21 U.S.C. §§ 952, 960, and 963 and Title 21 U.S.C. §§ 841 and 846 (conspiracy to import and importation of controlled substances and possession of a controlled substance with intent to distribute and conspiracy).**

# AFFIDAVIT

I, Special Agent Alyssa Julian, being duly sworn, hereby state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I submit this affidavit in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, for the **Target Account** associated with telephone number 209-460-9148, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B and relates to the investigation and prosecution of Nolverto VALENCIA Carbajal ("Defendant") for importing approximately 21.70 kilograms (47.84 pounds) of methamphetamine from Mexico into the United States.

2. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since March of 2022. I am currently assigned to the Cartel Investigations Team at the Office of the Deputy Special Agent in Charge in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center (FLETC) and have completed 900 hours of training as part of the Criminal Investigator Training Program and HSI Special Agent Training Programs at the FLETC. As a result of my training and experience as a Special Agent, I am familiar with federal criminal laws relating to controlled substance violations. As part of my training, I have completed course studies in, among other things, criminal law, constitutional law, search and seizures, courtroom procedure, evidence processing, drug smuggling, and other drug-related offenses.

3. During the course of my training at FLETC, I learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and use of electronic evidence – all in relation to violations of the United States Code. I have participated in training related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, heroin, and fentanyl. I

have also received training in the methods used by illicit drug traffickers to import, distribute, package, and conceal controlled substances.

4. As an HSI Special Agent, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As a Special Agent with HSI, I have recently investigated Transnational Drug Trafficking Organizations (DTOs). During my tenure with HSI, I have participated in the investigation of various DTOs involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and work with other law enforcement officers experienced in drug trafficking investigations, I have gained a working knowledge of the operational habits of drug traffickers. My work on DTO investigations has resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for controlled substances violations.

5. Through my training, experience, and conversations with other members of law enforcement, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico. I am aware that it is common practice for illicit drug smugglers to work in concert with other individuals and to do so by utilizing cellular telephones. Because they are mobile, the use of cellular telephones permits illicit drug traffickers to easily carry out various tasks related to their trafficking activities, including, *e.g.*, remotely monitoring the progress of their contraband while it is in transit, providing instructions to drug couriers, warning accomplices about law enforcement activity, and communicating with co-conspirators who are transporting narcotics and/or proceeds from narcotics sales.

6. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of drug trafficking organizations. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in the affidavit. This affidavit is intended to show simply that there

is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of Title 21, United States Code Sections 952, 960, and 963 and Title 21, United States Code, Sections 841 and 846, as described in Attachment B.

## JURISDICTION

8. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States … that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## FACTS SUPPORTING PROBABLE CAUSE

9. On March 10, 2024, at approximately 9:06 PM, Nolverto VALENCIA Carbajal ("VALENCIA"), a United States citizen, applied for entry into the United States from Mexico through the San Ysidro POE in vehicle lane #12. VALENCIA was the driver, sole occupant, and registered owner of a 2007 BMX X5 ("the Vehicle") bearing California license plates.

10. A Customs and Border Protection Officer received two negative Customs declarations from VALENCIA, who stated that he was crossing the border to go to San Ysidro, California. The CBPO received a computer-generated alert, and the Vehicle was referred to secondary for further inspection.

11. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the driver and passenger side floor area of the Vehicle.

12. Further inspection of the Vehicle resulted in the discovery of 44 packages concealed in non-factory compartments under the driver and passenger sides of the Vehicle, with a total approximate weight of 21.70 kilograms (47.84 pounds). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

13. VALENCIA was placed under arrest at about 11:55 PM. He was later charged with violating Title 21, United States Code, Sections 952 and 960, importation of a controlled substance.

14. A Customs and Border Protection Officer who was tasked to perform a secondary inspection of the Vehicle and inventory all the property seized from the Defendant and the Vehicle found two cellular phones, one on the driver's seat and the other in the center console.

15. VALENCIA was able to relay the number of one of the phones, a black iPhone, to law enforcement. But he could not recall the number for the other phone, a blue iPhone. He stated that it started with "209," and based on my review of public documents, 209 appears to be an area code covering, among other places, Stockton, California, the city VALENCIA stated that he lived in.

16. Law enforcement proceeded to search the black iPhone pursuant to a federal warrant. Review of that material showed about 82 entries saved under the "Contacts" category with a 209 area code, of which some entries appeared to be duplicative of one another.

17. But there were also two entries for 209-460-9148 (the number associated with the **Target Account**), a number that appears to be a second phone number used by VALENCIA. Both entries listed "noly" as the "Name" for the entry. (There was also third entry for the number ending in 9148, but it had no proper "Name" listed; instead, the full phone number was captured in the "Name" field.) And based on review of that phone download, "noly" appears to be a nickname for VALENCIA. First, his full first name is Nolverto, and "Noly" appears to be a natural, shorter version of that full name. Second, in certain text messages, third parties refer to the user of the black iPhone as "Noly", and in one outgoing message sent from the black iPhone, the user appears to sign the end of a series of messages with "-noly". Third, the Apple ID associated with the black iPhone is nolyvalencia140@gmail.com, appearing to incorporate both his nickname and last name. Fourth, there were otherwise no contacts listed for "Nolverto", or any derivation thereof,

save for two entries for "Noly Valencia," one of which listed the Gmail address reflected above. (The other entry listed only a unique alpha-numeric User ID, and neither entry had a phone number listed.)

18. On or about November 19, 2024, law enforcement requested that Apple preserve the iCloud data associated with the **Target Account**. Apple then confirmed that the data was being preserved.

19. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that the **Target Account** is being used to coordinate and facilitate the importation of controlled substances within the United States. Unless disabled by a sophisticated user, iCloud accounts are automatically created and information automatically backed up. If the user of the account is using an Apple device like an iPhone (like here), device information will be automatically backed up to their iCloud account. In my training and experience, drug traffickers commonly use cellphones in furtherance of their activities because, among other reasons:

   a. Cellphones are mobile and permit instant access to phone calls, text messages, web pages, and voice messages;
   b. Cellphones permit real-time, active monitoring of controlled substances while they are in transit;
   c. Cellphones can be used to easily communicate, arrange, and synchronize the times and locations for pick up and drop off of controlled substances;
   d. Cellphones can be used to communicate using encrypted messaging applications so as to hinder law enforcement monitoring.

Given that Apple confirmed that available data for the **Target Account** was being preserved, it is likely that the subscriber or user of the **Target Account** utilizes the iCloud file hosting service to backup data from his Apple cellphones. As described in the paragraphs below, the iCloud service can be used to backup and store data from iOS devices, third-party applications, photos, videos, documents, and other electronic data.

20. Subscriber and/or user information, including: all electronic mail, files, cloud storage, location information, search history, images, text messages, voicemail, histories, buddy or friend lists, contacts, iCloud Drives, iCloud files, iCloud Backup and Restore, photos, notes, videos, calendars, messages profiles, methods of payment, detailed billing records, access logs, and transactional data will lead to the identification of co-conspirators and other evidence of drug importation and distribution. Such information is likely to be stored in the **Target Account**. I further believe that evidence of drug trafficking (such as text messages, photos, videos, locations, and contacts) may be stored in the **Target Account**. In my training and experience, narcotics traffickers may be involved in the planning and coordination of drug importation events in the days and weeks prior to such an event. Given the arrest of VALENCIA late at night on March 10, 2024, for importing methamphetamine, I am requesting account data for the **Target Accounts** for the period between February 11, 2024, and March 11, 2024.

21. Additionally, it is believed that the records are still available to Apple as a request to preserve was made under 18 U.S.C. § 2703(f).

## INFORMATION REGARDING APPLE ID AND iCLOUD

22. Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

23. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

    a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages

("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

h. App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or

through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

24. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

25. An Apple ID takes the form of the full email address submitted by the user to create the account; it can later be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

26. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

27. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

28. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

29. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network

information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

30. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

31. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

32. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the

Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

33. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34. Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

35. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

36. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

37. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not. It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises. The impact on its business would be disruptive and severe.

38. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachments B-1 and B-2. In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. Those copies will be provided to me or to an authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

39. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in

a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

40. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

41. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

42. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//

**CONCLUSION**

43. Based on the foregoing, I request that the Court issue the proposed search warrant.

44. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

I swear the foregoing is true and correct to the best of my knowledge and belief.

ALYSSA A JULIAN
Digitally signed by ALYSSA A JULIAN
Date: 2024.11.22 09:52:56 -08'00'

_____
Special Agent Alyssa Julian
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 22nd day of November 2024.

*Allison H. Goddard*
_____
HON. ALLISON H. GODDARD
United States Magistrate Judge